# EXHIBIT 1

*24-1389-DLC Affidavit*

# AFFIDAVIT OF SPECIAL AGENT DALE C. CRISPIN IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Dale C. Crispin, state:

## Introduction and Agent Background

1. I have been a Special Agent with the Homeland Security Investigations (HSI) since April 2021. I am assigned to the HSI New England Human Trafficking group. My responsibilities include the investigation of possible violations of federal law, including, among others, sex trafficking, kidnapping, and other crimes against children. I attended and graduated from the six month Criminal Investigator Training Program (CITP) at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I was formerly employed as a police officer in the State of Vermont for approximately eight years. I spent six years on patrol and two years assigned to the Bureau of Criminal Investigations as a Detective. In connection with my duties as a police officer, I either authored or assisted in hundreds of search warrants and criminal arrests. Prior to becoming a police officer, I graduated from college with a bachelor's degree in criminal justice. My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2. I am currently investigating David WALKER for the robberies and attempted robberies of four convenience stores in Massachusetts in October 2023 in violation of 18 U.S.C. § 1951 ("Hobbs Act Robberies"); sex trafficking by force, fraud, and coercion in violation of 18 U.S.C. § 1591(a)(1) and (b)(1); transporting an individual in interstate commerce with intent that such individual engage in prostitution in violation of 18 U.S.C. § 2421 ("Mann Act"), and using or possessing a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c).

3. This affidavit is being submitted in support of an application for a warrant to search electronic equipment, specifically a cellular phone ("TARGET DEVICE 1") associated with the

number 857-399-3105 that was seized from WALKER's person and that is in the possession of law enforcement investigators, as described in Attachment A. There is probable cause to believe that TARGET DEVICE 1 contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B.

4. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED

### The Hobbs Act Robberies

5. As set forth in more detail below, in October 2023, four different 7-Eleven stores in Massachusetts were robbed. After reviewing evidence gathered to date and interviewing a woman associated with WALKER who had knowledge about all four robberies (*see* paragraph 18 below), I have probable cause to believe that WALKER participated in all four of the robberies. In addition, as set forth below, WALKER was arrested and charged with one of the robberies.

### 7-Eleven Robbery (West Roxbury) – October 8, 2023

6. Based on a review of surveillance and police reports, on October 8, 2023, at approximately 05:06 A.M., two males entered the 7-Eleven convenience store, located at 7 Spring Street in West Roxbury (Boston), Massachusetts, and approached the victim employee, who was on his knees praying at the time. One of the suspects ("SP1), who I have probable cause to believe was WALKER, approached the victim employee and pointed a silver and black colored handgun at him, while the other suspect ("SP2") stayed by the door serving as a lookout. SP1, still pointing the gun, handed the victim employee a gray colored bag and stated, "put whatever money you

2

have." The victim employee opened the two cash registers and took cash out of the registers; giving the money to SP1. The two suspects took approximately $600 in U.S. currency. The suspects fled the store on foot down Temple Street towards Hillcrest Street.

7. Initial reports of the robbers provided to law enforcement described SP1 as a black male, thin build, wearing a black hat, black jacket with a hood, black sweatpants with red and white stripes, he had a blue bandana covering his face, and was wearing white sneakers. SP2 was described as a black male wearing a black hat, dark three-quarter length coat with a hood, a black face mask, black pants, and black shoes. Boston Police were unable to identify any suspects at that time. Still images from that surveillance footage are included below:



7-Eleven Robbery (Cambridge) – October 13, 2023

8. While investigating the robbery at 7-Eleven in West Roxbury, investigators also learned the 7-Eleven located at 2245 Massachusetts Avenue in Cambridge, Massachusetts was robbed on October 13, 2023, at approximately 2:09 A.M. Based on a review of surveillance and police reports, two males entered the 7-Eleven convenience store in Cambridge.[1] Upon entering,

---

[1] It should be noted in the police report the victim employee reported that there were three suspects involved. One of the three suspects was present in the convenience store prior to the robbery and was leaning over the counter asking for a cigarette at the time the other two suspects made entrance. That suspect appears to back away and leave on his own. The other two suspects leave together fleeing with the money. Officers note in the police report that they were not convinced this first individual was involved in the alleged crime.

one of the suspects ("SP3") immediately went around the counter by the register and stated to the victim employee, "open the registers, I'll kill you," while brandishing a knife. The other suspect ("SP4"), who I have probable cause to believe was WALKER, then walked up to the counter, pulled out a black semi-automatic firearm, and stated "give me the money, open the register, I have a gun, I'll shoot you and I'll kill you." The victim clerk told police that the two suspects took the money before fleeing in an unknown direction. The two suspects took approximately $800 to $900 in U.S. currency. Cambridge Police noted that the victim employee appeared to be "shaken up and scared" during their interaction with him.

9. Initial reports of the robbers provided to the officers described SP3 as a male wearing a black hooded sweatshirt over his head with a mask and glasses, gray Nike sweatpants, and dark gray sneakers. SP3 is the suspect who displayed the knife. SP4 was described as a male wearing a light gray hooded sweatshirt over his head with a mask, light gray sweatpants, and light gray sneakers. The victim employee identified SP4 as the one with the black semi-automatic firearm. Cambridge Police observed this suspect on surveillance video pull out the black semiautomatic pistol, which appeared to be consistent with a Glock pistol, from his front waist band. Cambridge Police were unable to identify any suspects at that time. Still images from that surveillance footage are included below:



### 7-Eleven Robbery (Watertown) – October 16, 2023

10. As law enforcement continued to investigate the 7-Eleven robberies in West Roxbury and Cambridge, investigators learned that another 7-Eleven, located at 650 Mt. Auburn Street in Watertown, Massachusetts, was robbed on October 16, 2023, at approximately 2:18 A.M. Based on a review of surveillance and police reports, one male ("SP5"), who I have probable cause to believe is WALKER, and one female ("SP6") entered the convenience store, each armed with a black firearm, pointed the firearms at the victim employee, and robbed the store of approximately $600 in U.S. currency, lottery tickets valued at $620, and other items. Watertown Police observed the victim employee to be nervous and in shock from the robbery. The victim employee stated that both SP5 and SP6 walked into the store and both pointed firearms at him. The victim employee stated that the female suspect, SP6, then threatened to kill him stating, "if you move, I'll shoot you!"

11. Initial reports of the robbers provided to the officers described SP5 as a light brown skinned male, approximately six feet in height with a skinny build. SP5 was described as wearing a black mask, beige hooded sweatshirt, gray sweatpants with pockets, a black medical mask that covered a majority of his face, and blue sneakers with white soles. SP6 was described as a brown skinned female, approximately five and a half feet tall with a stocky build. SP6 was wearing a black hooded sweatshirt, blue jeans, black and white checkered pattern sneakers, a red medical mask with white and yellow patterns that covered a majority of her face and had a small multicolored backpack on. Both suspects were described as having tattoos on their hands and wrists. Watertown Police were unable to identify any suspects at that time.

<u>7-Eleven Robbery (Everett) – October 20, 2023</u>

12. Investigators identified an attempted robbery at a 7-Eleven in Everett, Massachusetts, which they believed was connected to the previous three completed 7-Eleven robberies that occurred in the days prior and described above. On October 20, 2023, at approximately 4:20 A.M, two individuals a male ("SP7") who I have probable cause to believe is WALKER and a female ("SP8") entered the 7-Eleven located at 280 Main Street in Everett. Based on a review of surveillance and police reports, at the time the suspects entered and approached the victim employee, who was stocking shelves. SP7 held an object under his sweatshirt, which the victim employee believed to be a firearm, to the employee's body and demanded she hand over the money while SP8 held open a bag for the money. At this time the victim employee pulled chemical mace from her pocket and sprayed both suspects with the mace; causing them both to flee the store. The victim employee stated the suspects entered a black SUV and fled the area.

13. Initial reports of the robbers provided to the officers described SP7 as a white male, tall with a skinny build, dark green/gray jacket with a black stripe down the sleeves, white sweatpants, yellow boxer shorts, black shoes, and a surgical mask. SP8 was described as a white female, short with a large build wearing black hooded sweatshirt, gray shirt, black sweatpants, red surgical mask. Still images from that surveillance footage are included below:



### Identification and Arrest of WALKER and T.B.

14. Watertown Police Department (WPD) responded to the Watertown 7-Eleven robbery. WPD put out a bulletin to other law enforcement agencies showing screen shots of both robbery suspects (the male and the female) and photos of their tattoos.

15. Cambridge Police Department was able to identify the two suspects as a woman with the initials T.B. and WALKER.[2] The detective was aware that TB and WALKER had signed up for a membership at a yoga studio in Cambridge on or around October 19, 2023 and, while WALKER was present, TB stole $200 from the studio on or around October 20, 2023. The Cambridge police had surveillance footage of WALKER and TB from the yoga studio theft and had matched them to their Massachusetts RMV photos. In the yoga studio video, WALKER appears to be wearing the matching pants to the jogging style jacket worn by the suspect in the Everett robbery. In addition, a law enforcement database contains photos of WALKER's hand tattoos in connection with WALKER's prior arrests and incarceration. Surveillance videos of the Watertown robbery captured a partial view of the suspect's hand tattoos – an "N" on his pointer finger and an "O" on his middle finger of one hand, and on the top of his other hand a partial picture of a face and distinct black angular shading. Those tattoos match photos of WALKER's hand tattoos (spelling out "NONE" on his fingers) in the law enforcement database. Similarly, TB's hand tattoos captured in the surveillance video match photos of TB's tattoos in a law enforcement database. In addition, law enforcement was able to identify make, model and license of the car that the suspects used in the Watertown robbery, and that car was registered to TB.

16. On October 24, 2023 WALKER and TB were arrested by state authorities in Somerville, Massachusetts. During the arrest, law enforcement seized a cell phone from TB's

---

[2] I know TB's real name but am not including it here to protect her safety.

7

person and a cell phone from WALKER's person. The cell phone seized from WALKER is TARGET DEVICE 1. TARGET DEVICE 1 is a black phone with a case. Watertown Police Department labeled TARGET DEVICE 1 as 23-838-PR and placed it into evidence.

17.   WALKER and TB were charged by the Middlesex County District Attorney's Office with Unarmed Robbery, Intimidation of a Witness, and Bomb Threat, among other offenses, for their participation in the October 16, 2023 robbery of the 7-Eleven in Watertown. WALKER has been detained pending trial on those state charges.

### Interview of T.B.

18.   On April 29, 2024, federal law enforcement interviewed TB. As set forth in more detail below, TB disclosed that WALKER forced her to assist him in the four robberies and attempted robberies described above, that WALKER used force, fraud, and coercion to make her engage in commercial sex for him, and that WALKER transported her and another female from Massachusetts to New Hampshire and Maine with the intent that the two females engage in commercial sex.

19.   TB stated she first met WALKER when she received a Facebook friend request from him in September of 2023. She met up with him soon after that.

20.   TB stated that at some point after they met, WALKER coerced and forced her to be the "getaway" driver when he robbed a 7-Eleven convenience store in West Roxbury, Massachusetts. TB stated that WALKER first made her drive him to a location in Dorchester, Massachusetts, where WALKER picked up a firearm. TB stated after WALKER picked up the firearm, TB drove WALKER to a 7-Eleven store in West Roxbury. TB stated WALKER ordered her to enter the store to canvas the area and told her that she did not comply with his orders, he

would kill her and her family. TB stated following her canvas, she reported back to WALKER who subsequently robbed the store with an unknown accomplice.

21. A short time later, TB stated WALKER ordered her to bring him to a 7-Eleven on Massachusetts Avenue in Cambridge, Massachusetts, in order to rob that store. TB stated she and WALKER picked up another male subject and drove into Cambridge. TB stated upon arriving to the 7-Eleven in Cambridge, WALKER ordered her to canvas the store prior to the robbery. TB stated she refused to do so and WALKER held a knife to her throat and threatened to kill her if she didn't comply with his order. WALKER then looked at the male subject and stated, "this is how I control my bitches." TB exited the car and attempted to enter the store but it was locked. TB stated she relayed that information to WALKER and he ordered her to call 911 to report the store being locked. TB stated she called 911 and the operator told her Cambridge Police Department would send an officer to the area.[3] TB stated that following her call to 911 the store was opened and she reported this to WALKER. According to TB, WALKER then exited the car and proceeded to rob the with an accomplice.

22. TB stated on or around October 19, 2023, WALKER made her steal money from a yoga studio in Cambridge, Massachusetts.

23. TB stated that WALKER forced and coerced her to participate in two additional robberies, one in Watertown and the other in Everett. These robberies occurred in the middle of October 2023. TB stated WALKER had been planning on robbing a bank but was never able to follow through on the plan because they were arrested.

---

[3] Cambridge Police Department does not have a record of this call, but it is possible that the call was directed to the state police, and we are continuing to investigate.

9

**Human Trafficking and Mann Act Investigation**

24. TB disclosed to law enforcement that in or around the end of September 2023, WALKER told her that it was time for her to start "sellin' ass." WALKER then arranged a "play" for TB, which, based on my training and experience, I know can refer to a meeting with a sex buyer, or a "John," for commercial sex.

25. TB stated that WALKER forced her to drive to Brockton, Massachusetts to meet a sex buyer. When she arrived in Brockton at the meeting place, WALKER exited the car and hid behind a fence while the sex buyer got into the car with TB. TB engaged in sexual intercourse with the sex buyer and he gave her $250.00 cash. After the sex buyer left, WALKER got back in the car and took the $250.00 from TB.

26. After her first commercial sex "date" in Brockton, WALKER forced TB to use cocaine in order to stay awake all hours of the day to engage in commercial sex with sex buyers

27. TB said that WALKER set the prices that sex buyers, would pay for sexual services with TB. "Full service" was $250.00 and oral sex was $175.00. From my training and experience, I know that in the context of commercial sex transactions, "full service" means sexual intercourse. TB stated WALKER required that the Johns pay only in cash for her sexual services.

28. TB disclosed that she was doing approximately 10 "plays" or commercial sex dates every day and WALKER required her to make $5,000.00 per day. WALKER required her to give him all of the money she made.

29. If a play didn't go the way WALKER wanted it to, or if TB didn't make the money WALKER wanted her to make, WALKER would physically assault her. During one assault, WALKER choked TB so violently that she passed out, causing her nose to bleed and her tongue to swell. She woke up to WALKER throwing water on her face.

10

30.     TB stated that WALKER forced and coerced her to create an advertisement on a website called AtlasEscort.com, which I know from my training and experience to be a website that advertises commercial sex. TB found a photo of a female that resembled her online and created the advertisements. Law enforcement has obtained copies of these advertisements and they contain a phone number known to have belonged to TB.

31.     TB initially did outcalls, which I know from my training and experience are commercial sex dates where the commercial sex provider goes to the location of the sex buyer, but then she switched to incalls, which I know from my training and experience are dates where the sex buyer comes to the location of the commercial sex provider. For the incalls, TB stated that she booked hotels through her Priceline account.

32.     TB also disclosed that WALKER forced her to have sex with him after doing a full day of commercial sex dates. WALKER would hold her down, place his hands over her mouth or around her neck, and have sexual intercourse with her.

33.     TB reported that WALKER took her and another female, L, to New Hampshire and Maine, where WALKER forced them to engage in commercial sex.[4] TB reported that she and L participated in a two-for-one commercial sex special in Maine where the sex buyer paid $300.00. and London participated in a two for one (2 for 1) in Maine special where the sex buyer paid via CashApp and then L paid WALKER half of the money.

34.     TB reported that WALKER was angry that the John used CashApp instead of paying in cash because CashApp was traceable. As a result, TB and WALKER fought and TB disclosed that WALKER hit her and choked her out.

---

[4] TB does not know L's real name, but she did give law enforcement the full nickname. I have identified L in this affidavit by the first initial of her nickname to protect her safety.

11

**Electronic Evidence from TB's Cellular Phone**

35. Following the interview, TB provided written consent for federal investigators to review the contents of her cell phone. A review of the cell phone showed communications between TB and WALKER outlining WALKER'S coercive control over TB as well as communications in furtherance of the crimes being investigated.

36. For example, a text message sent from WALKER's cell phone to TB's cell phone stated the following:

> LIKE WTF.. IM DONT TALKIN BOUT IT NBS CLEARLY UR NOT SERIOUS ABOUT THE ESCORT SHIT BCUZ REGARDLESS OF WHAT U SAY [TB] UR BEING VERY STUBBORN!! That's money you NEED jus as well ME: US THAT GIRL HAS NO MALICE NOR ISSUE IN HER HEART WITH YOU.. AND YES I DID SPEAK TO HER WITH MY BRO OTP the OTHER DAY AND YES SHE DOES WANNA DO BUSINESS WITH US STILL SHE SAID UR COOL IT AINT BOUT NOTHING YALL ARE GROWN I get the fact that u don't like gettin money with bitches, but frfr [TB] this is my PPLS shorty. She's not on no fuck shit with YOU OR ME AND THATS A FACT: IT BEEN STRICTLY BUSINESS WE DONT HAVE THE CLIENTEL CLICKING YET, SO WHY NOT CAPITALIZE OFF OF A REALISTIC SITUATION. HER CONSTANT JUGGS BE WANTING 2-GIRL SPEACIALS, THEN ITS LIKE UR GONNA BE GETTIN UR OWN REGULARS IN THE MIST OF THAT WHICH IS WHY I THINK U SHOULD TRUST MY VISION FOR US Let's enjoy this meal.. we need it."

37. TB's cell phone shows that she then texted to WALKER, "I feel like you're forcing me to get money with this chick and I don't like that."

38. Another text message WALKER sent TB read: "Listen babygirl I FEEL LIKE WE SHOULD JUST PLAY THE CRIB TO REST UP AND JUS FALL BACK U KNOW!! However, AS WELL THE MAINE SITUATION IS STILL ON THE TABLE FOR US NBS And I feel like ATP ITS WORTH IT AND LESS RISKY YOU KNOW AND BETTER YET ALREADY ARRAINGED.. IM NOT EVEN ASKING FOR HALF OF UR EARNINGS. YOU MAKE 500$

12

I'll take 150..GIVE IT SOME THOUGHT BABYGIRL… ITS DEFINITELY SOMETHING THATS REASONABLE FOR YOU [TB]!!"

39. TB's cell phone also has a text message WALKER sent to TB that states: "U SUCKED A TRICK OFF FOR 100$ without my consent..ur protector." Based on my training and experience, I believe WALKER is angry that TB engaged in commercial sex without his consent.

40. TB's cell phone contained text messages between TB and WALKER in which they discuss past and future robberies. For example:

    a. On October 21, 2023, TB sent WALKER a text message stating, "I hit fucking licks[5] with you put my freedom on the line, get maced in my face and this is how you repay ?"

    b. On October 24, 2023, WALKER texted TB, "U know wats good to.. Wenever u be pullin up to go places u should always be paying attention to the inside scenery energy,etc. ppl be in these stores walking licks moving real NAIVE AND DUMB ALSO TO MENTION EVEN PLAZAS IN WHITE AREAS DOLLAR TREES, PETCOS,etc COSTCOS Shopping plazas. Not to sound like a coward but you want scenery where it's WOMEN Less risk, much easier to finesse WITHOUTH having to lay a finger"

    c. TB texted WALKER on October 24, 2023, "Trust me, I understand where you're coming from and like you said earlier, we just need to lay low and hit easier licks that do not bring a lot of attention to us and we are gloves at all times"

    d. WALKER responded, "Exactly that's the thing rn babygirl there u go We can hit licks every fucking day or kill ppl if we wanted to tf. The choice is ours! However, it's the ATTENTION-RISK FACTOR THO"

---

[5] Based on my training and experience, I know that "licks" is a common street term for robberies.

13

### Investigators' Possession of TARGET DEVICE 1

41.     TARGET DEVICE 1 is currently in the possession of the Watertown MA Police Department, and is being stored at its facilities, as described in Attachment A. Investigators obtained the device in the following way: TARGET DEVICE 1 was seized from WALKER's person by Watertown Police Department when WALKER was arrested on October 24, 2023 and charged in Middlesex County with the Watertown 7-Eleven attempted robbery.

42.     Therefore, while the investigators might already have all necessary authority to examine TARGET DEVICE 1, I seek this additional warrant out of an abundance of caution to be certain that its search will comply with the Fourth Amendment and other applicable laws.

### PROBABLE CAUSE TO BELIEVE THAT TARGET DEVICE 1 CONTAINS EVIDENCE, FRUITS, AND INSTRUMENTALITIES

43.     As discussed above, TARGET DEVICE 1 is currently being stored by investigators at their facilities as described in Attachment A. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

44.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging

14

for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

45.  Based on my training and experience, and information provided to me by other agents, I know that individuals who illegally traffic firearms commonly use cellular telephones to communicate about and further their illegal activities. They use their cellular phones in order to communicate with suppliers, potential buyers, or other individuals potentially involved in unlawful business transactions and will maintain information about these individuals in their contacts lists, in saved text messages and in other places. These communications occur in a variety of ways, which include, but are not limited to text messaging (often used in lieu of phone calls to avoid speaking over the telephone), and messaging through applications such as Snapchat, WhatsApp, and Facebook.

46.  From my training, experience, and information provided to me by other agents, I know that individuals involved in sex trafficking frequently use electronic communications service and/or remote computing service providers, to carry out, communicate about, and store records regarding their daily activities and the activities of their co-conspirators and victims, and to further their criminal activity related to human trafficking. These tasks are frequently accomplished through sending and receiving text messages, e-mail, instant messages, and other forms of phone or internet-based messaging applications or other social media applications, including but not limited to using cellular phones to recruit and maintain victims and communicate with customers (a/k/a "dates") and co-conspirators.

47.  Based on my training, experience, and information provided by other law enforcement officers, I know that individuals involved in sex trafficking commonly take

15

photographs and create videos for commercial sex advertisements using cameras, cell phones, and other electronic devices that are then stored uploaded, shared, and stored on cellular phones.

48. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones such as the device sought to be searched here, can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

49. Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used

for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

50.   As described above, the investigation has uncovered evidence that WALKER has used his cellular phone, TARGET DEVICE 1, associated with the telephone number, 857-399-3105, to communicate with TB about commercial sexual exploitation and convenience store robberies in 2023. Based on my experience and training, I know that records relating to these communications, including text messages, are likely stored on his phone.

51.   As described above, I also have probable cause to believe that there are fruits, evidence, and instrumentalities of violations of sex trafficking, Mann Act, Hobbs Act Robbery, and firearms possession or trafficking present on TARGET DEVICE 1 from September 1, 2023 through October 24, 2023 in the form of communications regarding these crimes with other co-conspirators, victims, and witnesses, location information for WALKER, financial and payment information, photographs, and other information.

## CONCLUSION

52. Based on the information described above, I have probable cause to believe that WALKER has/have violated 18 U.S.C. §§ 1951 (Hobbs Act robbery); 1591(a)(1) and (b)(1) (sex trafficking by force, fraud, and coercion); 2421 (Mann Act interstate transportation with intent that a person engage in prostitution); and 924(c) (possession or use of a firearm in a crime of violence).

53. Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the equipment described in Attachment A.

Sworn to under the pains and penalties of perjury, by telephone

Dale C. Crispin
Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by

Donald L. Cabell
Chief United States Magistrate Judge

on June 17, 2024.